New York Elevated Railroad Co. agt. Manhattan Railway Co.

## SUPREME COURT.

*In re* the Petition of THE NEW YORK ELEVATED RAILROAD COMPANY agt. THE MANHATTAN RAILWAY COMPANY AND THE METROPOLITAN ELEVATED RAILWAY COMPANY.

*Manhattan Elevated Railroad — Lease — Appointment of receivers did not terminate lease — Where the court had taken the property to hold " until final judgment is entered" in the action, it could not, when the action was at issue, by answer denying the insolvency, without a trial surrender the property upon the alleged ground of insolvency — Court no power on motion to ascertain and settle conflicting claims of ownership — Effect of action pending in U. S. circuit court — Where a motion presents difficult questions of law and contested questions of fact, the court should refuse to consider and decide them in that summary manner, but leave the party to its remedy by action.*

The Manhattan Railway Company took leases from the New York Elevated Railroad Company and the Metropolitan Elevated Railway Company, of the elevated roads upon the Third and Ninth avenues

NEW YORK PRACTICE REPORTS. 15

New York Elevated Railroad Co. agt. Manhattan Railway Co.

and upon the Second and Sixth avenues in the city of New York. For such leases it issued its stock to the two landlord companies to the amount of $13,000,000 — $6,500,000 to each. By the terms of the lease the Manhattan Company was to operate the roads at its own expense, pay all taxes, the bonded debt of the landlord companies, principal and interest, and a yearly rental of ten per cent upon their capital stock in quarter-yearly payments. The leases run "for the term of 999 years from the date of organization of the Manhattan Company, to wit, November 1, 1875, *or so long as it shall continue to exist as a corporation, and be capable of exercising all the functions herein stipulated on its behalf.*" They also contained a clause to the effect that if any payment was in arrears for ninety days the landlord companies have a right to resume possession of their property. The leases and agreements are fully set out in the opinion.

In an action brought by the attorney-general in behalf of the people to dissolve the Manhattan Company for insolvency, receivers had been appointed to hold the property *pendente lite.*

After the appointment of such receivers the New York Elevated Railroad Company, one of the landlord corporations, applied to the court on petition to surrender to it its tracks and property then operated and possessed by the receivers upon various grounds, which are stated in the opinion:

*Held, first.* That the appointment of receivers did not terminate the lease. That the clause in such lease providing for its continuance for 999 years, "or so long as it shall continue to exist, *and be capable* of exercising its functions," would end the tenancy only when the corporation became *legally* disabled from fulfilling its contract, and that financial *inability* to perform would not have that effect; and that the appointment of receivers, under section 1788 of the Code, "to *preserve* the property," and which is to continue "until final judgment is entered," could not in law have the effect to *destroy* it, which the surrender would accomplish.

*Second.* That as the court had taken the property to hold "until final judgment is entered" in the action, it could not, when the action was at issue, by an order denying the insolvency of the corporation, without a trial of such action, surrender the property upon the alleged ground of the insolvency of the corporation.

*Third.* That while the court held possession of the property by temporary receivers, it had no power on motion to ascertain and settle conflicting questions of ownership in such property. This could only be done after a judgment of forfeiture had placed the property in the hands of the court for final distribution, and that until such a judgment was attained in the attorney-general's action, the only remedy of the petitioning company was by action.

*Fourth.* That an action being then pending in the United States circuit court for the southern district of New York, brought by John C. Watson, a stockholder in the Manhattan Company, in behalf of himself and other stockholders against the landlord companies, to which the receivers in this action were parties, for the purpose of recovering the value of the $13,000,000 of Manhattan stock transferred to them in professed payment of the leases, the court ought not, in advance of the trial of that action, surrender the property upon the ground that a quarter's rent was in arrears for the space of ninety days, as a trial of such action might show that Manhattan was not a debtor to, but a creditor of the petitioning company. The grounds of and questions involved in the Watson suit discussed and stated.

*Fifth.* That as the motion presented difficult questions of law and contested questions of fact, involving immense interests, in the exercise of a sound discretion the court should refuse to consider and decide such question in that summary manner, and leave the party to pursue its remedy by action.

*Sixth.* Motion denied, without prejudice to the right of the petitioner to bring an action against the receivers to recover its property, leave to do which is granted.

*Ulster Special Term, September, 1881.*

MOTION by the New York Elevated Railroad Company to have its railroads and property, now held by the courts under receivers appointed in an action brought by the attorney-general in behalf of the People against The Manhattan Railway Company, restored and surrendered to it.

*Comstock, Dorsheimer, Bacon & Lawrence,* for motion.

*Hamilton Ward,* Attorney-General, for People.

*Greene, Gulliver & Davies,* for Manhattan company.

*Shafer & Strauss,* for stockholders of Manhattan.

*Soren & Stone,* for Metropolitan Railroad Company.

*A. J. Vanderpoel, Wager Swayne* and *R. S. Ransom,* for receivers.

New York Elevated Railroad Co. agt. Manhattan Railway Co.

WESTBROOK, *J.* — On the 13th day of July, 1881, John F. Dillon and Amos L. Hopkins were appointed receivers of the Manhattan Railway Company, which was and is still a corporation formed under chapter 606 of the Laws of 1875.

The appointment was made in an action commenced by the attorney-general, entitled, "*The People of the State of New York, plaintiffs,* agt. *The Manhattan Railway Company, defendants,*" which sought to dissolve and extinguish the corporate life of the defendant, upon the ground, as stated in the complaint, that it " is and for more than one year last past has been insolvent."

The action in which such appointment was made has not proceeded to final judgment, but is now at issue by the service of an answer, verified by the oath of the president of the defendant, which among other averments and denials, contains the following :

" *Third.* It denies that it is, and for more than one year last past has been insolvent. It further denies that it has remained insolvent for one year."

The receivers are temporary and holding their positions under the power conferred upon the court by section 1788 of the Code.

Among the property which such receivers now hold, are the elevated railroads owned by the New York Elevated Railroad Company, and the personal property belonging and appurtenant thereto, which were leased to the Manhattan Railway Company by a written and sealed instrument bearing date May 20, 1879.

The present application, which is on behalf of the New York Elevated Railway Company, is by petition to this court, which appointed the receivers, to restore to it its railroads and property held by the receivers as the property of the Manhattan Railway Company under said lease.

Having stated some of the prominent facts involved in this motion and its object, it will be necessary also to mention some others somewhat in detail, that the questions involved may be understood and intelligently discussed.

The Manhattan Railway Company built for itself and owns no railroad whatever. Its original subscribed capital was $2,000,000, of which sum only five per cent ($100,000) has ever been paid. The roads which it operated were leased from the New York Elevated Railroad Company, and the Metropolitan Elevated Railroad Company, two separate and distinct corporations, each one of which owned and were at the time of the leasing, operating certain elevated railroads in the city of New York, and were each also then engaged in extending their structures.

On the 20th day of May, 1879, as preliminary to the leases which were executed on the same day, the New York Elevated Railroad Company, as the party of the first part, the Metropolitan Elevated Railway Company as the party of the second part, and the Manhattan Railway Company as the party of the third part, entered into a written agreement by which it was agreed that each of the parties of the first and second part should execute to the party of the third part, "leases of their respective railways, and other property, rights and franchises of every description, including patent rights, substantially in the form hereto annexed."

The object of the agreement is, by a recital therein contained, declared to be "for the purpose of avoiding the danger of crossing elevated railway tracks upon the same level, and otherwise securing to the people of New York the advantages of safer and more rapid transit through the action of one directing body."

The instrument also, among other things, provided for the completion by the owners of certain portions of the railway structures of the Metropolitan Elevated Railway Company, and of the New York Elevated Railroad Company, and for the building of certain other parts at the joint expense of the two, and prescribed (as already stated) the form of the lease to be executed by the said two companies to the Manhattan Railway Company, and the amount of the rent.

The Manhattan Company, " in addition to assuming pay-

ment of the principal and interest of the first mortgage bonds of the New York and Metropolitan Companies," as provided in said agreement, " and the payment of cash rental and guaranteed dividend as provided in the lease," also agreed " to issue and deliver to the New York and Metropolitan Compa-nies its two bonds, each for six millions five hundred thousand dollars, payable on demand, one to John A. Cowing, as trustee for the stockholders of the New York Company, and the other to John Baird, as trustee for the stockholders of the Metropolitan Company, with authority to the trustees respectively to use the same, if they see fit, in payment for stock of the Manhattan Company at par."

Under the clause just stated, the bonds provided for were executed, which were exchanged for stock in the Manhattan Railway Company, whereby the New York and Metropolitan Companies, or their stockholders, became the owners of the entire capital stock of the Manhattan Company, then amounting to $13,000,000.

It was further agreed that " whenever, in any fiscal year, the Manhattan Company shall elect to declare a dividend of more than ten per cent, on its capital. stock," the said Manhattan Company " shall pay to the New York and Metropolitan Companies a sum sufficient to enable them to pay as large a dividend in excess of ten per cent on the stock of the New York Company and Metropolitan Company as shall be declared on the stock of the Manhattan Company."

The leases, as has been before stated, bear the same date with the *tri-parte* agreement — May 20, 1879 — and were both in the same form and upon the same terms. That from the New York Company contained recitals as follows : That both it and the Metropolitan owned lines of elevated railway in the city of New York, part finished and other portions in process of construction, which on account of their crossing each other at various points could not be run with dispatch and safety to the public under two different managements, and that the system of roads, both for the public convenience

and safety, should be placed under one management; that the Manhattan Company was "by law authorized to construct and operate elevated railroads in the city of New York, whether owned or leased by it," and was willing to accept and take leases from the New York Company and the Metropolitan Company of their respective railways and properties, which said companies had agreed to execute; and that the Manhattan Company had agreed to pay the principal and interest due and to grow due upon $8,500,000 of first mortgage bonds of the New York Company, and also the principal and interest upon any further and additional bonds which the New York Company might issue at the request of the Manhattan Company "for the purposes of constructing and equipping extensions of the line of the New York Company," and a dividend of ten per cent upon the "par value of six millions five hundred thousand dollars" of the capital stock of the said New York Company.

After the recitals, which in substance have been given, the lease proceeds to say: "Now, therefore, this indenture witnesseth, that the New York Company, for and in consideration of the rents, covenants and agreements hereinafter mentioned, reserved and contained on the part and behalf of the Manhattan Company to be paid, kept and performed, hath granted, demised and leased, and by these presents doth demise, grant and lease unto the Manhattan Company all and singular the railroad or railway now owned, operated or constructed by it in the city of New York, as above described, and all and singular the unfinished portions thereof now under construction, together with all its franchises, rights and privileges relating thereto, or to the construction and operation of its entire railway as authorized, subject to the said mortgage and to the terms and conditions under which said franchises are held by the company, with all and singular the right, title, estate and interest which the New York Company has in any real estate in the city of New York heretofore acquired by it, or which it may hereafter acquire under contracts already made

therefor, being all and singular the entire property and estate
of said New York Company, excepting such of its franchises,
rights and privileges as are or may be necessary to preserve
its corporate existence or organization, and its interest in the
covenants and conditions of this indenture;

"To have and to hold the said railways, premises and
appurtenances unto the Manhattan Company and its suc-
cessors for the term of nine hundred and ninety-nine years
from the date of organization of the Manhattan Company,
to wit, November first, eighteen hundred and seventy-five,
or so long as it shall continue to exist as a corporation and be
capable of exercising all the functions herein stipulated on its
behalf, the Manhattan Company and its successors yielding
and paying therefor unto the New York Company, its suc-
cessors and assigns yearly, in each and every year during the
term hereby granted, the yearly rent of ten thousand dollars,
payable semi-annually on the first days of January and July,
during the said term, the first payment of five thousand dol-
lars to be made on the first day of July, eighteen hundred
and seventy-nine, and keeping and performing all and singular
the covenants and agreements hereinafter set forth, to be by
the Manhattan Company kept and performed."

The granting and *habendum* clauses have been given in
full, as the relief asked for depends largely upon their
language.

The lease also contains covenants and stipulations to the
effect following : The Manhattan Company obligated itself to
pay the principal and interest of the New York Company's first
mortgage bonds as they matured; to pay each and every year
to the New York Company, beginning with the first day of
October, 1869, "six hundred and fifty thousand dollars, free
of all taxes, in equal quarter-yearly payments of one hundred
and sixty-two thousand five hundred dollars each, on the first
days of January, April, July and October in each year, the
first of such payments to be made on the first day of January,
eighteen hundred and eighty;" to make out and furnish to

the New York Company "all reports and statements which the latter shall or may be by law required to make or file;" to run and operate all the roads of the New York Company at its own expense, keeping the same in thorough repair, and doing all that was necessary to be done, or which the New York Company was obligated to do, to keep and maintain the structures and business, and to extend the latter as the growth thereof might require; to pay "all taxes, assessments, duties, imposts, dues and charges whatsoever, which shall become payable by, or be levied, assessed or unpaid during the said term by any lawful authority upon the New York Company, or upon the demised railways, premises, or any part thereof, or the business, earnings or income of the same;" to return to the New York Company at the expiration of their lease all tools, implements, machinery, &c., then on hand which were required, to be at least equal in value and quantity to those received by it; to indemnify the New York Company not only against all expenses of operating the road but against all claims and suits for damages of every kind; if the Manhattan Company failed or omitted to pay in full the cash rental or the guaranteed dividends as they became due, or neglected to perform its covenants or any of them, and such default continued for ninety days, the New York Company was authorized to resume possession of its railroad and property; the companies mutually covenanted to execute any further writings needed to carry out the agreement; the Manhattan Company was not to assign the lease or sublet without the written consent of the New York Company, but the Manhattan Company could renew its corporate existence, which it agreed to do, for the whole term of the lease before the expiration of its present life; to establish a sinking fund for the payment of the first mortgage bonds of the New York Company, and to notify the New York Company at any time within six months and not less than three months before the maturing to renew or extend the time of payment of all bonds not extinguished from the sinking fund, the mode and manner of accomplish-

ing which was specified; and lastly the New York Company makes the Manhattan Company "its agent and attorney to do in its name any and all things necessary to be done for the complete execution of this indenture."

The New York Elevated Railroad Company asks for the surrender to it of its railroads and structures upon the following grounds: First. That the lease has expired by its express terms, it being stipulated in the *habendum* clause that the holding was not to continue absolutely for 999 years, but it was likewise to terminate and end by the failure of the Manhattan "to exist as a corporation," and also by its becoming incapable "of exercising all the functions" specified in said lease on its part to be observed and kept. The termination is claimed to have been reached: 1st. By the appointment of the temporary receivers; and 2d. By the actual insolvency of the corporation. Second. By the failure of the Manhattan Company to pay the taxes levied and imposed. Third. By reason of its not performing certain other stipulations and agreements in the lease; and fourth. By supplemental petition presented since the argument upon the original application, the grounds of which have just been stated, the restoration of the property is sought for the reason that the Manhattan Railway Company is now in default ninety days upon its payments, and that the petitioner is consequently entitled to a surrender of the property.

Before discussing the questions presented it is proper to state that when the lease was made the individuals who largely controlled the New York Elevated Railroad Company were the same persons who controlled the Manhattan Company. The ability of the Manhattan Company to fulfill the obligations imposed by the lease depended, as was well known by the lessors, upon its success in business. It had no capital, as has been before stated, except the leases. Its stock — $13,000,000 — had been all transferred to the New York and Metropolitan Companies in payment for such leases. That stock has largely been placed upon the market and sold, and'

is now held by persons not stockholders in the lessor companies, so that if this application succeeds, whatever of value such stock represents will be most summarily, and as it were by a single stroke·of the pen, wiped out forever. This fact is not stated as an answer to the present application, for if the relief asked by the New York Company is stipulated in the bond it must be afforded, but the gravity of the consequences certainly requires great care and caution in the conclusion to be reached.

The grounds of the application will be considered in the order already stated, and in their discussion several facts in addition to those which have been narrated will be mentioned.

*First.* Has the term ended by reason of the appointment of temporary receiver, or the actual insolvency of the Manhattan Company, if it is insolvent?

The argument urged in favor of an affirmative answer to the first branch of this question is founded upon the *habendum* clause of the lease, which provides: "The Manhattan Company and its successors" may have and hold "the said railways, premises and appurtenances * * * for the term of nine hundred and ninety-nine years from the date of organization of the Manhattan Company, to wit, November first, eighteen hundred and seventy-five, *or so long as it shall continue to exist as a corporation, and be capable of exercising all the functions herein stipulated on its behalf ;*" and such argument is in brief this: An order has been issued in this action, enjoining and restraining the Manhattan Company, its officers and agents, from interfering with its corporate property, and placing such property in the hands of temporary receivers, as provided by section 1788 of the Code ʼof Civil Procedure, and therefore the company is not now capable of exercising the functions stipulated and provided for in the lease. The soundness of this argument depends, of course, upon the meaning of the clause in the lease which has just been given. Did the contracting parties intend that any order made by any court or judge which had power to grant it, and which

temporarily, and perhaps erroneously, disabled the Manhattan Company from fulfilling its obligations under the lease, should at once put an end to its existence; or did they contemplate a termination thereof only with the existence of the corporation, or the happening of some other event, which, like its corporate death, would make the fulfillment of its stipulation a legal impossibility forever? The former construction certainly involves a most supreme trust by the contracting parties in the infallibility of human intellect and human integrity. The lease and the tripartite agreement are evidently the productions of careful counsel familiar with legal proceedings, who were fully aware that during the many years they were to continue the lessee company would again and again be subjected to injunctions and orders, which would for a time at least suspend its functions, and during such period make the fulfillment of its stipulations impossible. The thought, therefore, cannot be entertained that the parties intended that the term upon which property representing millions of dollars depended should rest upon so frail a tenure. The other construction must therefore be adopted, because it is evidently more in accordance with the intent of the parties. The expiration of the lease by lapse of time was first provided for, and then another, which depended upon the actual ability of the corporation to fulfill its agreement, to be determined by its corporate existence and its capacity to exercise the functions which the lease provided it should exercise. Such capacity, however (applying to it the maxim *noscitur a lociis*), from its joinder with the preceding clause of the same sentence, is to depend not upon a temporary disability, but upon one which, like its corporate death, makes it forever incapable of exercise. This conclusion is also rendered necessary by the fact that other parts of the lease have carefully and distinctly declared the stipulations which the Manhattan Company is to keep and fulfill, and the consequences to it from their non-fulfillment. All these agreements might be faithfully kept, and yet because a tem-

porary injunction, afterwards dissolved, has for a time tied its hands and incapacitated it from fulfilling its agreement, it must, if the argument of the petitioning company is sound, surrender its property and estate. Such a conclusion cannot be adopted. The Manhattan Company has not yet been dissolved nor declared incapable of fulfilling its covenants. The issues involving that result remain to be tried in the mode prescribed by law. For the protection and security of all persons interested in the corporation, the court has taken its property for preservation, to use the language of the statute (*Code, sec.* 1788), "until final judgment is entered." It is impossible that the step which the law authorizes to be taken — using again its own language — "to preserve the property," shall destroy it. Such a result the parties to the agreement never contemplated, and such a holding would defeat an express enactment of the law-making power of the state.

It is claimed, however, that even though the appointment of the receivers has not terminated the lease, that the Manhattan company is actually insolvent, and that consequently its term is ended, because it is no longer "capable of exercising all the functions" stipulated in the lease on its part to be observed and kept. This proposition presents the second ground upon which the expiration of the lease is claimed, and it again involves the meaning of the clause in the lease, which has already been partially discussed. In what sense is the word "capable" therein used? Was the lease to expire whenever, from financial embarrassment, the company was unable to meet its engagements, or was it to terminate only when the corporation, from some legal cause, became incapable to fulfill its agreements? From the connection of this expression by the copulative conjunction "and," with the provision that the lease should continue for 999 years, "or so long as it shall continue to exist as a corporation," and from the further fact that the consequences of the non-fulfillment of its pecuniary obligations to the landlord companies are elsewhere in the same instrument distinctly provided for and

stated, it has already been intimated that it refers to the legal and not the financial inability of the tenant company to perform its covenants. As the question is one of importance, it may not be improper to add in this connection a few words upon this point.

The precise word used will be noted. It is "*capable*," and the clause containing it reads, "or so long as it shall continue to exist as a corporation *and be capable* of exercising all the functions herein stipulated on its behalf." There is, it seems to me, both in law and in common speech, a difference between the words "capable" and "able." An individual, for instance, may be capable of conveying or devising property, though he may not be able to do so because he has none; he may also be capable of exercising the functions of a citizen, though from his physical surroundings he may not be able to exercise them. These illustrations show that the word "capable" has reference to the legal capacity of parties, whilst the other, "able," though sometimes used in the same sense as the former, involves, in addition, the exterior surroundings. Bouvier thus defines the word "capacity:" "Ability, power, qualification or competency of persons, natural or artificial, for the performance of civil acts depending on their state or condition as defined or fixed by law; as the capacity to devise, to bequeath, to grant or convey lands, or to take and hold lands; to make a contract and the like." This definition completely covers the point under discussion. The lease to the Manhattan Company continued for 999 years, or so long as the corporation was legally capable of fulfilling its stipulations in the lease contained. No other expiration and ending of the term by lapse of time is provided for, though it is true that by subsequent provisions of the same agreement the rights acquired thereunder might become lost and forfeited by the failure to do that which it had covenanted to perform.

In addition to the difficulties to the surrender of the property on the grounds now under consideration, which have

been presented, there is also another. The Code (*secs.* 1788, 1789) defines the duties of the trust which the court has assumed through its receivers. The primary object is the preservation of the property for the benefit of those persons or parties who may be entitled thereto. The present proceeding is really an attempt to settle summarily on motion grave questions between the New York Elevated Railroad and the Manhattan Railway Company, involving immense pecuniary interests, concerning which the facts as well as the law are disputed. What power has the court to settle and determine these questions in this manner? Do not the constitution and laws of the state both require a trial according to prescribed rules to decide such complicated rights between parties? If the property sought was still in the possession of the Manhattan Company, it is clear that the petitioner would be compelled to institute a suit for its recovery. Has the appointment of the receivers made such a course unnecessary? If by any process known to the law the rights of the Manhattan Company in the property sought to be obtained by this motion had been adjudged to be ended, and the court had taken possession of it for the purpose of distribution, then in a summary way it could, doubtless, ascertain its owner and award to such owner that which belonged to him. But no such adjudication has been made, and cannot be made until the issues which the pleadings in the action present have been disposed of according to due form of law. In a land of law, courts have no arbitrary power. The possessor of property cannot be permanently deprived of its possession except by proceedings which are well defined. It is true that the court has taken the property into its custody, but it has not yet determined that the Manhattan Company's rights therein have been extinguished, and it is powerless so to decide except by a trial of the action. This application, therefore, so far as it depends upon the alleged insolvency of the corporation, must fail, because, as the law forbids the court to forever deprive it of its property upon that ground without a trial, it cannot

indirectly on motion do in effect that which is equivalent thereto, to wit, surrender and award it to another as owner for that reason, when the insolvency is denied, and upon it a trial according to the regular course of procedure is demanded. It is only when the rights of the Manhattan Company have been extinguished in the manner and according to the proceedings prescribed by our statutes, can they be permanently deprived of their right to enjoy the property they possessed, and until such extinguishment the court is powerless to afford the relief which the petitioner asks.

As to the alleged forfeiture of the lease by the failure of the Manhattan Company to pay the taxes which have been imposed, and which is the second general point the motion presents, there are two answers, either of which must be fatal to the demand of the property upon that ground: First. The petitioner, the New York Elevated Railroad Company, has, by the consent of its officers and legal advisers, approved and urged the resistance to their payment, and that which it has encouraged cannot be claimed as a forfeiture of the lease. Second. The Manhattan Company has paid all taxes which it is advised are legal, and the attempt by lawful means to avoid the payment of a greater sum cannot be a viclation of the terms of the lease, for it is only required to pay taxes duly and properly assessed.

In regard to the third point made by the petitioner, the non-performance by the Manhattan Company of provisions of the lease — the keeping of the railroad of the petitioner in repair and the preservation of its property — it is only necessary to observe that the affidavits upon this point are too conflicting to justify a conclusion upon the facts, and the remedy must be sought by action.

The concluding and fourth ground upon which the petitioner's right to recover possession of the property is based, is that the Manhattan Company is now in default for the non-payment of its rent, and has been for the space of ninety days, which default, by the express terms of the lease, works

a forfeiture of the estate, and justifies a re-entry and resumption of possession by the New York Company. Without discussing now the power of the court to afford relief for the reasons already stated, or how far the injunction and receivership in this action would prevent a forfeiture, the answers which the Manhattan Company and the receivers have made thereto will be at once considered.

On the 2d day of July, 1881, a suit was commenced in the superior court of the city of New York by the petitioner, the New York Elevated Railroad Company, as plaintiff, against the Manhattan Railway Company as defendants, in which action an injunction order was obtained, which is still in force, whereby the Manhattan Company, its officers, agents, attorneys and servants " were enjoined from parting with any moneys then in their possession or under their control, or under the control of the said Manhattan Railway Company, which had been received or might thereafter be received by it from passenger or other traffic on any of the railways of the said New York Elevated Railroad Company, except as required strictly for the operation of the railways belonging to said New York Elevated Railroad Company and leased to the said Manhattan Railway Company." It is difficult to see how the petitioner is in a position to enforce a forfeiture arising from the non-payment of money, when it has itself enjoined the tenant company from using the principal part of its revenue for any such purpose. Waiving, however, this point, there is another of great importance also made by said answers of the Manhattan Company and the receivers, which will now be stated.

It will be remembered that the capital stock of the Manhattan Company is $13,000,000. This entire stock was transferred and given to the New York Company and the Metropolitan Company in professed payment of the leases made to the Manhattan Company — $6,500,000 to each. It is true this was not directly done, for the form was the execution of two bonds by the Manhattan Company of $6,500,000 each, the one

New York Elevated Railroad Co. agt. Manhattan Railway Co.

to a trustee for the benefit of the New York Company, and the other to a trustee for the benefit of the Metropolitan, which bonds were exchangeable for the stock of the Manhattan Company at par, and such exchange was immediately made. The directors of the Manhattan Company were persons who were directors of the other two companies. By the terms of the lease the Manhattan Company was to pay the bonded debt of the other companies, with the interest, and also an annual dividend of ten per cent on the capital stock of the lessor companies in quarter-yearly payments. The plain effect of this transaction is manifest. The lessor companies, being the owners of the stock of the lessee company, and their directors being its directors, the individuals owning the stock of the former really agreed with themselves to pay to themselves a large and liberal rental for the use by themselves of their own property. This was the real transaction, but as individuals were concealed under the cloak of corporations, the apparent transaction, which the general public would only be apt to see, was a leasing from two independent corporate bodies to a third equally independent. Such leasing, however, was at a rental, which, if the estimates of the earning capacity of the leased roads submitted upon this motion by the petitioner to prove the bankruptcy of the tenant company are accurate, it was impossible for such company to pay. The individuals who had thus extracted the life from the lessee company by the provisions for the payment to themselves of liberal dividends, and the absorption of its entire stock, proceeded to divide and did divide such stock among themselves, and then disposed of it to the general public, thus shifting the burden of paying rent from themselves to others, and actually receiving from such strangers to the original transaction large sums for the privilege of assuming burdens they could not discharge, and which could only result in the restoration to them of the property leased, and the absolute loss to the buyers of Manhattan stock of their whole purchase-price. To recover payment for this stock from the two lessor companies, an action

is now pending in the United States circuit court for the southern district of New York, brought by John C. Watson, a stockholder of the Manhattan Company, to which suit, by permission of this court, the receivers appointed in this action are parties. The existence of this action and the grave question which it presents are urged by the Manhattan Company and the receivers as reasons why, in advance of the determination thereof, this court should not surrender the property it holds by its receivers.

It would, perhaps, be improper to express an opinion upon the merits of this action further than to say that it presents reasonable grounds for judicial inquiry. As a rule stock purchased of a corporation must be paid for either in cash or its equivalent, and if not so paid for the money which it represents can be recovered. The answer of the petitioning company is, of course, that the stock was paid for by the lease which it gave. Whether, however, this was a *bona fide* exchange of a substantial thing which the law can treat and regard as a payment for the stock transferred, or the contrary, is the point which that suit presents. Leaving out of view the very grave question of the power of the lessor companies to lease its roads, and of the lessee company to accept them — which is not considered because not presented nor argued, but which leases, if illegal, because *ultra vires*, would leave the stock of the Manhattan Company entirely unpaid for — is it not most apparent that the innocent holders and purchasers of stock of the Manhattan Company have grave questions to submit to the courts both as against the lessor companies and also their stockholders who placed the Manhattan stock upon the market to their great injury? It is enough for present purposes, without passing directly upon the merits of the Watson suit, to say that that which is unjust is unlawful, and for every unlawful act done to another to his injury the law affords a remedy. Whether any of the apparently bald facts which have been mentioned can be explained so as to give them a different color is a question for the trial. As they

appear upon this motion to me it is plain that they should not be ignored and the property asked for surrendered upon the ground of non-payment of obligations incurred by the lease, when, perhaps, a trial of the action pending may determine that the Manhattan Company is not a debtor to, but a creditor of the petitioner.

Thus far the questions which this application involves have been considered upon their merits and a conclusion adverse to the relief sought has been reached. There is another ground, however, upon which the petition should be denied. Confessedly it is one addressed to the discretion of the court. In *The People* agt. *The Erie Railway Company* (54 *How.*, 59) I expressed an opinion adverse to the disposal of grave and difficult questions of law and of fact upon motion rather than by action, and in that case refused the relief sought upon that ground, leaving the party petitioning to his remedy by action. There is nothing to distinguish this motion favorably from the one to which allusion has just been made. On the contrary, the present presents graver legal difficulties, more controverted questions of fact and much severer consequences than the other. In adhering to a former opinion, and denying this application upon the ground that the granting thereof would not be a wise exercise of judicial discretion, I follow convictions long since carefully adopted, strengthened by subsequent reflection and in accordance with judicial precedents (*Angel* agt. *Smith*, 9 *Ves. Jr.*, 335; *see opinion of lord* ELDEN, *p.* 338; *Emperingham* agt. *Short*, 3 *Hare*, 461, 469, 470; *Hauselt & Schroeder* agt. *Velmar*, 3 *Weekly Dig.*, 31; *Iselin & Hunter* agt. *Port Royal R. R. Co.*, 6 *Weekly Dig.*, 130; *Palys* agt. *Jewett*, 32 *N. J. Eq.*, 302). To the general objection of deciding such grave questions as this application involves so summarily is added one growing out of the *triparte* agreement hereinbefore detailed. A sort of *quasi* partnership was thereby formed between the three contracting parties. The Metropolitan Company joins its objections to those of the Manhattan Company, and protests against the

granting of the petition, and claims the right to be heard by a formal suit upon the issues which have been presented. Their request is reasonable and the relief asked for must be denied upon the ground of discretion also, without prejudice, however, to the right of the petitioner to bring an action against the receivers, leave to do which will be granted.